Good morning. Is that Mr. Buck? Okay, so we've got Mr. Lobson arguing for the appellants, and Mr. Kaplan, and Mr. Buck on the other side for the City of Seattle. And you represent all defendants' appellees? Yes, I do. Okay, great. All right, well, we've got this set for 20 minutes per side. And, of course, we then have another case involving at least the same common issue of the emergency order that's going to be argued. I don't know, has there been – I see that Mr. Buck is arguing on both of them. Is there any coordination in terms of the issues between the two cases, or do we just let each be argued as they please? We have – we, the appellants, have conferred a great deal, but we have not split the issues topically in any way. I think it's – it's my personal opinion. Okay, we'll just handle it one case at a time. There's more than enough for the 40 minutes. Okay, great. Why don't we let you proceed, Mr. Lobson? Thank you, Your Honor. May it please the Court, my name is James Lobson, and I represent Mr. Menotti, Mr. Selman, Mr. Scove, and Mr. Stettle. This is a case about a municipal policy to prohibit in advance political protest speech in a traditional public forum. One of the issues you have to decide is whether or not there was such a policy. I can only submit that the city itself called it a policy at a televised press conference. They announced in these words, we are going to adopt a policy to take the core area where the conference is occurring and prohibit any demonstration within that core area for the remainder of the week. Our position is that anyone who goes in that area to protest will be arrested. The city maintains that there's nothing written in Civil Order No. 3 that says no protesting, no political protesting, and they're totally correct. It doesn't say that in the text of the order, and it is totally irrelevant, as the U.S. Supreme Court has on a number of occasions said municipal policy doesn't have to be written, and certainly announcing it, the mayor and the chief of police announcing it on TV makes it a municipal policy. The city itself in this case conceded that this was a no-protest zone policy. The Seattle City Council conducted hearings, subpoenaed documents, issued reports, and made findings, and the city of Seattle concluded that in practice, the so-called limited curfew zone was treated by the police as creating a no-protest zone. Pretty much all of the officers who were deposed said we were told not to allow any protests in here. Captain Fugel, who was the head of the demonstration management platoon, said I was told no protests in here. You can find that all the way down to the officers on the beat, like Officer Smith, who on tape can be heard telling my client, Mr. Scove. It looks like on the face of the policy, they would keep out all protests, but it also looks like they would keep out all activities other than protests that weren't related to the delegates who were at the WTO convention or businesses or people shopping at businesses. I'm not sure that I understand your question, Your Honor, and I'm not sure that I would agree in a sense that it keeps out all protests. Here's my question. The emergency order didn't say we shall exclude all protests. It said we're excluding by limited curfew. I don't know if these are the exact words, but in substance we're excluding everyone in the world except people who live there, people who have businesses there, people who need to show up for the businesses to operate, and people involved with the WTO convention. Agreed, but then the operations order distributed to the police by the chief of police said, and you let in anybody with a reasonable purpose. And a reasonable purpose, they said, is they live there, they work there, or any like-type reasonable activity. Like, oh, they said shopping specifically. So in a sense, it let in absolutely everyone in the world except visible protesters with their buttons and signs. And they even let in protesters. If they had reason to be there, a reasonable basis to be there, does not mean they are going to allow anybody and everybody in the world but protesters. Well, they let in protesters who took off their buttons and signs, is my point. We've given you a dozen affidavits of protesters who they let in after they took off their buttons and signs. People who worked in the zone came up to the zone with a button and sign and were told, you can't come in here with that button on, even though the order says they can come in there, even though they showed, in some cases, the order to the police. But I work here. Well, the word is reasonable. The question is the definition of reasonable. And why doesn't reasonable mean only that they have to work there, they have to live there, they have to shop there? And merely because the police officers made a mistake on ten, maybe ten affidavits that you provided, does not mean that everyone was allowed in. The police officers knew that reasonable means everyone but protesters. I think there's a really easy answer to your question, Your Honor, and that is that as a matter of law, the U.S. Supreme Court has ruled on many occasions that a standard like whatever the police think is reasonable violates the First Amendment, precisely because it allows the police to decide what's reasonable. And that is exactly what happened in this case. In this case, it was admitted, it was admitted by Chief Ferguson, that realistically there would be disparate results, that one person would go up and say, this is my reason for going in and would get in. Another person would go up and would not get in. That's on page 440. I may have grabbed the order itself, but I believe that they gave specific statements as to what constitutes reasonable. As I said, you can almost argue the specific rules in general, because there it should have been clear to the police officers that the type of reasonable access will be someone who is working there, living there, and shopping there. Well, actually what it said is a reasonable purpose includes work, shopping at specific locations within the perimeter, or other type reasonable activity. And the mayor himself acknowledged that he left it to the police to decide what that meant, and the mayor himself said it didn't surprise him that the assistant chief of police left it to every single officer on the beat to decide what that meant. And the officers on the beat had all kinds of different interpretations of what that meant, although one thing was clear, was that shopping was perfectly okay. And go ahead. I'm sorry. Well, I just want to sort of cut to the chase and give you an example. In your very first remarks, when you said that they adopted a policy and you referred to the oral statements, why was it necessary for the city to adopt emergency order number three? Legally, why was that necessary? I don't know that it – I mean, why is it necessary to have it on paper? I don't know the best answer. What was the significance of calling it a – Not much. To call it an emergency. Was it because if you violated that order, you could be – the people could be arrested? Well, that's what they wanted to create, a reason to arrest anyone in there that looked like a protester. Now, in – Now, let me ask you this, though. Suppose that the city – that the mayor and the chief had not actually enacted this written document, but had proceeded on their stated oral policy that you just articulated a few minutes ago. Where would we be? Same place. And it's still a policy. It's still unconstitutional. Well, for purposes of evaluating what standards we apply to their written policy, do we look at the written policy or do we look at their oral statement? Maybe I can answer it this way. If we at the very least raised a genuine material issue of fact that they may have had an unwritten policy, then you must reverse. And surely we did that. I think that you can find as a matter of law that they had such a policy, enforced such a policy. You have nothing in the record from them to rebut any of the affidavits that we presented. When we presented you all these affidavits, the people walk up to the checkpoints on the later days and say they have a sticker on them. The officer says you can't go in there with that sticker on there. Take it off, you can go in there. That's an absurd policy that does nothing to protect the safety of the people of the city of Seattle or the delegates or the demonstrators or anyone. But that's the policy they adopted. And there's nothing in the record to say that was not what the officers did. What they can say is, well, that's not what it said in the written text of Order No. 3. That is immaterial, whether it's in the text or not. Well, presumably, though, Emergency Order No. 3 really reflects the official policy of the city because it apparently has the force of law. I guess what I would say is this. Certainly it reflects the official policy of the city. I think maybe in a moment of unguardedness when they were announcing this on TV, they stated quite honestly what they were doing. They were stopping all political protest. We didn't put those ñ maybe the lawyers very carefully crafted the language of Order No. 3 so it wouldn't say that. But that's what it was going to do. That's what Chief Joyner recommended to the mayor they do. The mayor said, whatever you say, Chief Joyner, and that's what they did. Let's take, from your perspective at least, let's just take this that we need to look at the policy, the written policy, Emergency Order No. 3. And as Judge Gould referenced a minute ago, you look at it and it seems to be content neutral on its face. On its face it seems to be content neutral, yes. So let's just take that track for a moment and then look at it through intermediate scrutiny, which is what we would do. Look at time, place, and manner restrictions. And let me ask you, is it your position that you raised tribal issues of fact with respect to, you know, the elements of time, place, and neutral? More than that. Time, place, and manner. More than that. It is my position that as a matter of law it's not ñ it doesn't fit the definition of ñ It's narrowly tailored. It isn't narrowly tailored. It doesn't leave open ample channels. It doesn't ñ the policy doesn't serve the admittedly compelling interest in public safety. And that's ñ Well, you don't have to ñ Could I answer that just first, Your Honor? Yes, Your Honor. Could I just ñ because that is central to your question. Right. And let me just ñ let me just elaborate on it and then you can tell me whether it's the same question that's been asked. It seems to me if in fact they decided, the police officers, it was left to the police officers to decide what was reasonable and your point of view is that the only thing they did was to require that there were no badges, no signs of protest, then isn't it really a genuine issue of material fact? You've got essentially ten affidavits, correct, that say that? Yes. I think we have ñ I think we have 13, but there's none on the other side that say anything else. Well, the question is whether or not the officers acted reasonably. I don't agree, Your Honor. That's not the question. Well, wait a minute. What reasonably means? Isn't that ñ and if you leave it to the officers as to what reasonableness means, that's the problem? That is the problem. And you've created a genuine issue of material fact on that because you have 13 affidavits. No, it's not an issue of fact. I mean, Cox v. Louisiana, Forsyth County, Staub v. Baxley, Coons v. New York. In fact, it isn't an issue of fact. Why did you offer the 13 affidavits? What do you need them for? We need them hopefully to prevent summary judgment from being entered against us, Your Honor, but as a matter of law, if you give a police officer the ability under a standard like whatever is reasonable to you, the discretion to decide you can come in, you can't, you can speak, you can't. Well, but there is some limitation to that. The limitation comes in the ñ No. Your Honor, it doesn't matter what the facts are. It doesn't matter whether the officer was reasonable. It doesn't matter whether the officer made very reasonable decisions about who to let in, who not to let in that you and I would all agree with. The fact that he had the discretion to decide is itself illegal under all those cases. And under your cases you have said that simply giving a police officer that type of discretion means is the absolute antithesis of a reasonable time, place and manner restriction. Those are your cases. And, yes. And the decision whether or not it is reasonable, just that word creates the problem. Yes. Okay. Absolutely. And the fact that there are some examples which are perhaps the specific rules of general, it's your position that that doesn't give the police officers some guidance? I think it's irrelevant, Your Honor. Under the law, it is irrelevant which way the discretion is exercised. The fact of the matter is they had totally unconfined discretion. But if I want to answer the question you asked me a while ago, to talk about why this policy is totally irrational and how it doesn't make any sense to say that it protects anybody to do this. If you have a person who comes with peaceful intent to the edge of the boundary zone on December 1 with some stickers on, and they're told, you can't come in here with this sticker on. Now, in this hypothetical, my first person is bent on only peaceful demonstration. That person takes off their sticker and is then allowed in. That did absolutely nothing in that hypothetical person's situation to increase safety. The next person, hypothetically, who comes to the boundary is one of these black block anarchists from Eugene who broke windows at Starbucks the day before. He comes up, not wearing any buttons or stickers, or he quickly takes them off, says he's going shopping at the Gap, and gets in. It's not the stickers that are going to break windows. It's the people, maybe, some tiny little fraction of people, less than 1 percent by the city's own admission. So imagine all around the zone these little piles of buttons, stickers, and signs piling up, but the people coming in. Kagan. Let me ask you this. If they put the button back on, they get arrested. How would you define it so that the police officers would not have discretion, and assuming there's an emergency, how would you define it so that the police officers knew what they should do and not exclude those people who were, who at least claimed that they came in for the purpose of peaceful protest? I wouldn't attempt to because that's completely the wrong approach. And the right approach is to have enough police there to be able to deal with law breakers, catch them, jail them, and punish them. But does the Constitution, I mean, what, I'm not aware of any case that says that that's the only permissible approach for the government. Well, actually, Collins, which we've argued, Collins is a good case for your side to some degree. But Collins expressly reserves, and I want you to address this language, okay? Collins says that we need to reach, we need how to address how to deal with a case where there was widespread continuing violence that appears to be beyond the ability of the police to control. And then there's another question reserved, we needn't decide whether, if there's specific reliable information that organized violence of a serious nature is about to occur, whether that might justify a determination that a clear and present danger exists, warranting the banning of a particular demonstration. Neither of the questions reserved are precisely this case, but both of them are close to it in some ways. So my question, Mr. Lobson's, is if the City of Seattle determines there's a clear and present danger of harm to delegates to the WTO or the President of the United States who's visiting, can they adopt a safety zone and limit who's going to be in there? No. There are an awful lot of things I'd have to say no to in your question. And if I could, I'll go back and start with Haig v. CIO, which is a U.S. Supreme Court case from 1939, where the court said it will always be easier to prevent riot and civil anarchy by banning assembly or protest. Always. But the Constitution forbids them that alternative. The Constitution says they instead have a duty to maintain order. In this case, the City of Seattle ignored all of its own staffing projections and predictions and went into WTO week with 400 police officers to deal with an anticipated 45,000 to 50,000 protesters. Well, let's assume they were negligent in that regard. Still, once things got out of hand. Once things got out of hand, they needed. What case says that they can't act to prevent a danger to the President of the United States and to delegates from 130 countries? Your Honor. I'm putting aside whether particular arrests are wrong, and I'm putting to the side whether there's an unwritten policy that you make a claim about that raises other issues. But just whether they could do the written policy. Because what the accepted and constitutionally permissible way of doing it is to get enough police in there so that you don't have to ban First Amendment activity, which is what they did on Wednesday, Thursday, and Friday. Because by then they had enough police in there. Is there any case that says that having enough police to arrest everybody is the only method that's permissible? Well, I think Haig and Collins both say that, Your Honor. Collins says the courts have held that the proper response to potential and actual violence for the government is for the government to ensure an adequate police presence and to arrest those who actually engage in such conduct rather than to suppress legitimate. You're saying that's Collins? Yes. And I'm saying that's I just alerted you to the language, which I'm sure you're familiar with, where Collins reserves Yes. two questions that are closer to this case than the facts of Collins itself, perhaps. I don't. And I'm getting to that. I don't disagree with that. But if Collins reserves those questions, you can hardly argue that Collins decides those questions. Well, Collins talked about continuous, uninterrupted riotous activity. In this case, Captain Pugel and Chief Joyner and others, they're all unrebutted. In the record before you said order was restored by about six or seven on Monday evening. Order was restored. Where it reserved the question relating to continuing violence, that was reserving the question whether you could ban all demonstrations. And that's what they did here. And then the second thing was whether if you have intelligence of a danger, of a clear and present danger, whether you could ban sort of a particular demonstration. Well, here they didn't ban all demonstrations. They banned all demonstrations perhaps in the so-called no protest zone. But there could have been demonstrations at Seattle Center. There could have been demonstrations on the streets outside of the zone. In other words, they didn't ban all demonstrations. They may have precluded protesters from approaching the delegates. But why is this different than the questions reserved in Collins? I don't think this question was reserved in Collins. Collins also says that Sheriff Hongisto contends that the First Amendment allows the banning of all protests on the inference of a continuing threat of past misconduct. This Court rejected that argument specifically, saying specifically just because there was violence on day one does not mean you can ban protest activity later on in the week. The violence in Collins on day one compared to the violence and the number of people involved compared to the violence in Seattle on day one and the number of people involved are, you know, totally different orders of magnitude. If the police have things under control at 6 in the morning and the President's arriving after the sun rises, you mean that they can't do anything? They have to sit and wait for more violence? Well, that is what Collins held. But I don't think that they have to do nothing, if that's what you're asking me to say. Are you saying even if it's reasonably foreseeable, do they have to wait until somebody, after creating a curfew, they have to wait to determine whether or not there's going to be additional violence? What about the fact that they were still meeting, the organization was still meeting and the protesters were there to send a message? Isn't that sufficient for the police the next day to continue with the protest zone? Well, I don't know what you mean by when you say the protesters were there. But you rejected the idea that since it's reasonable to expect violence tomorrow, we can ban demonstrations tomorrow. That was the argument Hongisto made. That was the argument you rejected. You're talking about Collins. Yes, I am. Okay. And I'm way over my time, I think. I have a couple of last questions for you. Suppose the city had just banned everybody from entering the area except members of the WTO. Well, that would have solved some of the problems here, a lot of them. Isn't the real problem here is that they just allowed people in and out? If they were concerned about violence. That is one. There are two problems that that would have solved. First of all, it would have solved the problem that it doesn't make any sense to let people in if they just say, I'm going shopping. And that's like the Watchtower Bible case. And that's a very similar case, Your Honor, where the city of Stratton said, you can't come in here if you're going to go door-to-door canvassing. That's their zone. And the Supreme Court said, what's the interest that that serves? And they said, that serves a public safety interest. It cuts down on crime. And the Supreme Court said, no, it doesn't. It keeps the Bible distributors out, but the criminals are going to come in anyway. Just like this case. Take off your button. They come in anyway, regardless of whether their intentions are violent or not violent. But if they were to ban everyone, if that's what it said, nobody can come in here. It would be a lot more like the cases like Chalk. It would not have this problem of police discretion of who comes in and who doesn't. It wouldn't have any possibility to be content discriminatory. And it would be a lot more like Chalk, too, if it was a nighttime. It would also cause some collateral damage to all the businesses of Seattle. Yes, it would. Greater collateral damage, right. Absolutely. You agree with that, then? That was reasonably foreseeable. That would occur. That people? Well, it didn't happen. But if it had happened that they had said nobody can come in here, then it would be reasonably foreseeable that they would have made less money in their stores during Christmas. Yes. Judge Gould's comment, I think, wasn't it, that the businesses would have lost money, income, revenue? Yes. Yes, of course. Not that they would have been damaged, you know, not that there would have been physical damage. Let's say I'm way over my time. I'm still not through with you yet. Oh. Okay. I'm glad. We're going to hear. You haven't addressed the individual defendants in this particular – in the individual plaintiffs in this particular case. I'm just wondering, let's just assume for a minute that if we disagree with you on – if we were to affirm the district court's decision, then do all the individual plaintiffs drop out? No. One does. Three don't. One does and three don't. Mr. Selman's claim would be gone. Okay. And if we were to reverse and send back, then they all – it's your position they would all go back. Yes. Yes. I didn't plan to address the individual specifics of any of my four clients, but I'd be happy to answer questions about that if you want. I have a theoretical question for you. I don't want to let you go yet. Okay.  Now, again, you know, taking you off your Collins argument for just a minute, but just if we view this – if we don't look at discretion and reasonableness and what the police – your position, what the police are doing, just at the policy and if we test it under the standards for something content neutral, contrary to your argument, assuming that we conclude it's content neutral on its face, and we're just looking at the question whether there are ample channels for alternative speech. Okay. I just want to focus you just on that issue. Okay. But – Okay. Now, you may not want to get there, but if I'm there – I just want to protest that you're skipping over whether it's content neutral as applied. No. I'm assuming it's content neutral. Okay. Okay. And I'm assuming that it's narrowly tailored. I'm now on the prong of – I'm not saying I'm assuming that for my decision. I'm saying for your question. Okay. Because I get to ask the question as opposed to you here. But you get to answer it, luckily. I'll do my best. The question is, when we look at ample channels for alternative speech, who is the audience? Is there any precedent that says who the audience is for which the protester has to have an ample channel? If the protester can fully communicate to the world, to the federal government, to the state government, to the city, to the general public, by media, but they can't get into the face of, like, a dialogue with the WTO delegates, is that an ample channel for alternative speech? Or is there precedent that says that they have to be permitted to confront the delegates or to get their message to the delegates? Just focusing on that and putting all the other difficult issues aside, what's your view on that? My view is, first of all, that there are several audiences. And it would not be accurate to say that there was one audience or that one was a primary audience necessarily. If I had to pick a primary audience, I would say it's the fellow citizens of Seattle that are inside the downtown core.  Some people were interested in talking to the delegates, but I think there were not very many. Okay. So if the channels permit communication to the city of Seattle fellow citizens but don't permit communication to the delegates, is that constitutionally provisional? Absolutely not. And I think since about 1920-something or 30-something, it's been black-letter law that because a person could demonstrate somewhere else, it's not a constitutionally valid reason to say they can't demonstrate here. I think that's Schneider v. New Jersey or Schneider v. State. But does that? Okay. You've answered my question. I'm willing to let you go. Well, thank you, Your Honor. I don't know. I have questions now. We've taken you over your time. Mr. Buck, we'll want to have ample time, too. I would urge you not to omit addressing the overbreadth issue, which I didn't have time to discuss. We may even request supplemental briefing and give you another opportunity to talk to us in writing. Thank you. Good morning, gentlemen. I'm Ted Buck for the city of Seattle. What happened during WTO was an unprecedented event in Seattle's history, and frankly, it's an unprecedented event, as I believe you recognize, Judge Gould, in the case law that is potentially applicable to what happened out there in that week. There is no reported case that I'm familiar with, and believe me, I spent a lot of time We don't have to look for a case that's on all fours, do we? No, we don't. No, we don't. We look to see what, you know, the Supreme Court has said about the First Amendment. Not entirely, Your Honor. Then what do we look at? What the Supreme Court says is you look at the circumstances. Well, that's only part of what you look at. That's true. You also look at the law. You look to see what the Supreme Court, what principles the Supreme Court has laid down in this area of the law. And I appreciate that question, Your Honor, because I think that's seminal to the way that you're going to have to rule on this decision, because what the Supreme Court has said over and over again is you can't simply take some platitude of First Amendment law and something like prior restraints are abhorrent under the law and apply it to a situation without considering the circumstances of the situation, because prior restraints, even if they're content-based, are sometimes okay. And you can't just look at the circumstances and ignore the law. Obviously, that's never going to work. So what the Court has to do, and what Judge Rothstein did, is said, okay, what are the circumstances that led to the restriction, and are they within that context content-neutral, reasonable, narrowly tailored? Do they leave open ample alternative channels, et cetera? Let me ask you, though. Are the circumstances here as a matter of law clear such that there is no genuine issue of material fact? On just that basis, that's where we start. Are the circumstances as to the state of emergency, Your Honor? Right. I would say yes. Then it's clear? I would say it's yes. Let me ask you this, then. As counsel just pointed out, it was at 6 o'clock on the day before Emergency Order 3 was promulgated. The city said everything is stable or under control? Yes, Your Honor. What's the import of that? Absolutely nothing. Nothing? Absolutely nothing. So nothing was under control then? No. No. I don't say that, Your Honor. The downtown core was silent, quiet, I should say, in the wee hours of the morning of December 1st. It usually is in the wee hours of the morning. Protesters go home to sleep. So that's what was meant when the office, when they said it's under control. That's exactly what they meant. That it was nighttime, it was quiet. And to suggest that because people actually do leave to go and get meals and sleep and so forth means that you can't anticipate the chaos that is going to come the next day, that everything that you know suggests is going to continue. Had the police at 6 o'clock that night, by that 6 o'clock hour of the day, had the police adequately positioned themselves at that time? As of December 1st at 6 o'clock? Yes. The night before they promulgated the emergency order. Oh, no, Your Honor. The night before was November 30th. At 6 o'clock on November 30th, there were approximately 50,000 people in the streets of Seattle. The police were basically helpless to try to clear the streets. They were using every means at their disposal to try to do it and were failing miserably. The entire downtown core of Seattle was shut down to vehicular traffic. So at 6 o'clock, when they talk about, is that on the 30th or on the 1st? They're talking about in the morning of December 1st. And frankly, I don't know where the 6 o'clock number comes from. Ed Joyner's communique that they're referencing says that by the early morning hours of December 1st, the wee hours, downtown was quiet, albeit destroyed, but quiet. And where were all the demonstrators at that time? At home. Asleep, somewhat. So the city was just, there was nothing going on. It was 4, 5, 6 o'clock in the morning. Let me ask you this. I'm still trying. What was the purpose? Why did they have to issue an emergency order? Because they faced an emergency, Your Honor. The police were overwhelmed. There was no way to clear the streets. What did that allow them to do by issuing an emergency order? I still don't understand that. The Seattle Municipal Code, and incidentally, that's not an issue for the Court because the plaintiffs have conceded that the Municipal Code Ordinance I understand that. I want to know what was the benefit of having an emergency order? What did that allow them? In other words, they could have just stood up there and said, here's our policy. We're going to arrest every demonstrator that's in this core area. Anybody that's even remotely looks like they're going to be demonstrating, we're going to arrest them. It gave the mayor the authority to create new, essentially, rules, regulations, orders, legislation, for lack of a better term, so that he could give police officers the authority they needed to restore order to the streets without it being an ad hoc decision-by-decision basis. And that would have been more prone to constitutional challenge. But that's what ended up happening, though, isn't it? Isn't that correct? I don't believe it is, Your Honor. If I understand correctly, your question is, isn't it true that what happened was just an ad hoc enforcement of the order? Yes. No, that isn't what happened. So every officer was applying the same standards. No, I don't believe that's true. But, you know, there has never been a time in the history of the United States when every officer in a police department has applied the same standards, which is why we have individual liability. That's the difference between municipal liability and individual liability. I have no doubt that there were officers out there that used that. So what standards did an officer on the street know they were to apply in deciding who was going to be allowed to enter the no-protest zone? They were the testimony that's before the court in the excerpts of the record show that the officers were informed that people who worked within the zone, who were credentialed WTO delegates, who lived within the zone, things like that, were to be allowed in so that their normal functions could occur. And just as you said, things like that, that's where the, I presume, Petitioner's problem is, is that you don't have necessarily the specific rules in general, because the things like that give the police officers greater discretion than they should be allowed. I don't believe it does, Your Honor. There is no such thing as a criminal statute that doesn't give a police officer discretion. Every time a police officer goes out to exercise his or her discretion, there are forced exercises. But I don't think about that. I'm thinking very hard about the criminal code, and I don't remember anything that resembles things like that, this type of activity. Of course, this is, this is in a way a potential for criminal activity, because they, if the protesters come in, then that's in violation of the things like that, portions of the code. And I understand the thrust of your question, Your Honor, and perhaps I can answer it by addressing it the way that the courts have addressed it. Whether or not something is sufficiently defined, sufficiently non-vague, sufficiently limiting in discretion to police officers is a pretty simple test. Would a person of ordinary intelligence understand what they were doing violates the law? We have affidavits from the plaintiffs in this case, presumably people of ordinary intelligence, who say, I understood what it meant. If you didn't live there, work there, or have legitimate business there, you couldn't get in. That's what the police officers said, too. Now, if there's discretion to be exercised under those circumstances, the discretion comes with the term other legitimate business or reason to be there. But those are the kinds of questions that we want police officers to exercise discretion on. As the Supreme Court has said, if a police officer is out there waiting for everything to be fully defined before he or she acts, we're going to have a sorry system, I paraphrase, but that's essentially what they said. Let me ask you this. What authority – who issued this operations order and what was the authority of that person to modify, essentially modify, the emergency order number three? The Hart-Ferguson order, Your Honor? Yes. Well, that – Hart-Ferguson was the night incident commander. That was his interpretation of the events and what was permissible and what was not permissible. Where does he get – if you read the emergency order number three, it says, except the following persons are allowed into the zone. Delegates from the WTO, employees and employers of – and owners of businesses, persons who reside within the limited curfew area, representatives of the press, city officials with valid identification, and emergency and public safety. And then it's revised to include a reasonable purpose. Your Honor, Chief Ferguson didn't revise emergency order number three. All he did was interpret it. The order says specifically that people allowed in are employees and owners of businesses within the limited curfew area and other persons necessary to the operation of those businesses. Are customers necessary for the operation of a business? I think if you ask any business owner, they would say yes. They interpreted it that way, I assume. I'm sorry, Your Honor? I assume they interpreted it that way because they let shoppers in, right? Retail outlets without shoppers are not open. Well, I just – So they're absolutely – they're probably more essential than employees are. Okay. So let – just to pursue this issue, what happened on that day under this order if a panhandler wanted to get in? Do you know? Yes. Does the record tell us? Yes. Did they let panhandlers in? No, unless they lived in the zone. So that wasn't a reasonable purpose, then, to go? No. How about window shopping? I suppose that an individual officer may have exercise and discretion on that front. If somebody said they were going in to shop, intending to window shop, or just – I just want to look around. I want to, you know, I want to go – Your Honor, I don't know how they would have handled that. Window shopping often leads to shopping, but I don't know. But what people other than protesters would be excluded, as you understood the policy? One of the problems the city faced in the WTO week, Your Honor, were bystanders. They were a big problem because police officers' ability to respond to incidents of violence. Someone's curious. They just want to be down there to see what's going on. Exactly. And there was a lot of that that week, I'm sure. So they would not be permitted in. Exactly. But all they had to say was, I want to go get a cup of coffee at Starbucks. Presumably, yes, Your Honor. Then they could get in. Then they could get in. That's all they had to say. Let's – you know, I think I understand what your concern is on this, Judge Payaz, and allow me to address it this way. The City of Seattle has never, ever held that they didn't want WTO speech inside – anti-WTO speech inside the zone. In fact, there was a CLE just weeks after this at which speakers for the city, including myself, said, listen, if somebody's pulling stickers off people who are legitimately supposed to be getting into the zone, that's a problem. And I'm not going to sit there and say it isn't a problem. But when you're analyzing these kinds of restrictions, Your Honor, the court's duty is to look at what the evil is that the city is trying to restrict. The evil the city was trying to restrict was not anti-WTO speech. The evil was getting people out of the streets so fire aid crews could get to people who were having heart attacks, so that people could get to their jobs, so that employers could continue to make their livelihood, so that folks who live there could make it home, so that WTO delegates could make it to the venues without being mugged. Well, it's pretty clear. I mean, they certainly have raised the question, a fact, with respect to who would be allowed into the zone. I mean, if one of the purposes of this whole policy was to prevent protests and violence within the zone, they've raised it. They've presented affidavits that people who just had little stickers were excluded from the zone, even if they worked there. Well, Your Honor, and as I said – What purpose did that serve? As I said, if police officers on an individual – you've got to remember, too, that these affidavits came hours after this order was issued. So did they expect – Well, I'm concerned about whether or not they raised – you know, you're here because the district court said there's no – there are no genuine issues. A fact in this case can be decided as a matter of law, period. And that's Atticus v. Kress, Your Honor, answers the question that you're raising. It's a Supreme Court case that talks about what does it – Well, I'm prepared to take you – you know, the city had adopted a written policy, and it looks like it's content-neutral on its face. So then you have to look at the – how we evaluate it. Are the restrictions in time, place, and manner restrictions? You know, look at whether or not they're narrowly tailored, alternative avenues of communication, and whether – how arbitrary the decision-making was. Perhaps if we take a step back, a lot of times – The problem is, if you look at narrow tailoring, they've raised significant facts about how the policy was actually implemented. Again, allow me to just take a step back, and let's look at the arguments they're raising in the guise of what the Supreme Court has already said about this. They're saying because you're keeping protesters out but allowing everyone else in, that it's not correct. You can't do that. The Supreme Court has said it a hundred times. You can do that. Well, suppose you had a much narrower zone, and you kept everybody out. If it met the requirements, Your Honor, hypothetically, of course that would be all right. The Supreme Court has said that that's fine as well, as long as the government has sufficient interests and it's narrowly tailored. There's a reason this zone looks like a Texas congressional district. It's a gerrymandered thing. The city was interested in getting protesters right next to as many venues as possible while maintaining an area that they could actually stop this kind of illegal behavior. The point was to get people out of the streets so that police officers could respond to the lawbreakers. So if your black front, whatever the fellows, the people from Eugene's names are, does take his sticker off and says, I'm going to go into Starbucks, and so the police let him through, and then he pulls out a Molotov cocktail and throws it at the front of Nike Town, the police can get to him. They can do what Mr. Lobson wants them to do, go and get the lawbreakers. On November 30th, they couldn't do that. Well, apparently, well, it was the harm that the city was aiming at with the no-protest zone. I'll call it that, whether limited curfew or no-protest zone. We prefer limited access. I understand. But everybody's, you know, it clearly was a no-protest zone. Even the district court concluded it was a no-protest zone. So let's just call it that and accept that for now. But was the harm that was being aimed at just protection of the delegates from harm, or was it a more general aim to restore order and to avoid anarchy? Your Honor, that is exactly the point of this whole thing. As laid out specifically in Emergency Order No. 3 and as the city has maintained throughout, there are about 15, not just significant government interests at stake here, they're compelling government interests. The safety of the citizenry, not just people who live and work in the area, but also the protesters. The ability of people to get to work has been described by the Supreme Court as a compelling government interest. If you can't get to work, you can't earn money. You can't take care of your family. But the problem was the protesters. The problem was the people who were violating the law by clogging the streets. But those were not the bystanders. Actually, Your Honor, some of them were. A lot of the problem was bystanders. Is that admissible evidence that's in the record? Your Honor, there's nothing in the record that evidences what the makeup of the 40,000 to 50,000 people were. Can you answer my question? Yeah. And right now we don't have anything to establish that there was anyone other than the protesters that precipitated the action by the city, right? Precisely the situation faced by the Supreme Court in the Madison decision, the Hill decision, and the Schenck decision, where in two of those cases, both injunctions that were subject to even stricter scrutiny than a governmental decision that's not of an injunction nature. You've been arguing here today something that we have to intuit. And that is that not the protesters are the problem, but the protection goes beyond that to the individuals who happen to be in the street, the bystanders. But in terms of the facts that would establish that, there's nothing in the record, is there? Which creates a genuine issue of material fact. I don't believe there's any issue of fact that the restrictions that were placed had anything to do with speech, Your Honor, if that's what you're getting at. And frankly, as the Supreme Court has said, it's okay to restrict activities as to a particular group if it's only one group that's causing the problem. But a statute that is more inclusive and less content or viewpoint restrictive is better. Well, their contention is here this is just all a guise to keep out all WTO protests, period. And they present evidence to that effect. Well, there apparently were some officers who did take signs and stickers away from people, but that is not evidence of the city policy. But as applied. As applied, they could have gone after those individual officers. The question is whether or not the city had a custom policy or practice of doing  And they've also, if you look at the affidavits that they presented, they apparently have, I mean, they're pretty strong for purposes of summary judgment to say that at least with respect to narrow tailoring and alternative avenues of communication, that they haven't raised a tribal issue of fact. Your Honor, I disagree with that wholeheartedly, and here's why. The statute, there's absolutely nothing in the evidence which suggests that anybody was allowed to go in there and protest on any issue. There is no suggestion that police officers allowed people who were pro-environment to wear stickers and take signs in. There is no evidence that people who were in favor of the WTO or people who had labor union, pro-labor union signs were allowed to go in and only people were stopped with anti-WTO signs. There's no evidence of that whatsoever. So, again, as long as as applied, the city. They're really evidence because that you wouldn't have had this order had there not been protests the day before that caused problems. So we're really talking about the protesters and not the bystanders, although you've mentioned something concerning bystanders, but that's not in the record. The precipitating factor was the exercise of First Amendment rights. Just like it was in Madsen, Hill, and Schenck. In each one of those cases, the Court said, obviously, all they're trying to do is stop abortion protesters, but that's okay under the circumstances. That is, as long as it is within its scope. Its scope is not broader. As long as it's narrowly tabled. So broad that it really denies them, in effect, their First Amendment rights. Well, let's analyze what the Ninth Circuit has said about that, Your Honor, because I think if we look through it from an objective point of view, you'll agree with me that that's not right. Bay Area Peace Navy is a case that leaps immediately to mind. There was no indication in Bay Area Peace Navy that there was going to be any violence whatsoever, no indication that dignitaries would not be able to get to the viewing platforms, no indication that it was going to interfere with the parade of ships in the Bay, nothing which would suggest that a few people in some pleasure boats going by the front of the reviewing area were going to cause any trouble whatsoever. And the court in that circumstance said a 25-yard protective zone was okay, but 75 yards was too much. Under those circumstances, they had nothing to worry about compared to what the city of Seattle had. And what we drew up, what the city drew up in this zone, no protest or whatever you want to call it, was a purposeful, thoughtful effort to get people closer than 25 yards to the people who were involved in the WTO ongoing discussions by putting them right next to their hotels, right next to the venues. So if it's okay in Bay Area Peace Navy when they've got no problems that they can point to to say this is going to raise a problem, how could it not be okay where a police department – this is Seattle and Washington, D.C., for example, close to the same population. D.C. has 9,000 police officers. Seattle has 1,000. Mr. Lobson says the solution is to bring in more police officers. They didn't have any more police officers. They had people working 18-, 19-hour shifts just to try to keep things close to order. There was no option. Under those circumstances, having people right next to where the delegates are staying and working so that you can contact them by just raising your voice isn't sufficient ample challenge. How can we reconcile Bay Area then with this? Okay. Well, we took extra time before, so if the judge has any questions. He's going to be coming back in just a few minutes. You're going to be back. So do you feel you're ready to stop for now? Well, unless you want me to just continue on for another 20 minutes, Your Honor. There's plenty to talk about. We're going to have another case. Thank you. Thanks. Now, Mr. Lobson, unless my colleagues vote me down, I'm going to want to propose that we get some supplemental post-argument briefing on some issues as they crystallize. So you may or may not have that opportunity. But in rebuttal, do you want to say anything now further? If I have two minutes, one minute, I'd appreciate it. Two minutes. Sure. No problem. I'd like to just address sort of two questions. I'd like to draw your attention to Board of Airport Commissioners versus Jews for Jesus because that is, in many respects, a very similar case. There, the L.A. airport had a rule of no First Amendment activities in the airport. And there was some briefing and dispute about whether or not the airport was a traditional public forum, but the U.S. Supreme Court said we don't have to decide whether it was or wasn't. We'll assume it wasn't. We think it obvious that such a ban cannot be justified, even if it's a nonpublic forum, because no conceivable government interest would justify such an absolute prohibition of speech. And I bring that up because I've heard some arguments that Collins doesn't apply because that was the whole city and this was just the downtown core of a city. Well, Jews for Jesus was just an airport, not the whole city of Los Angeles. So the district court judge never addressed our overbreadth argument at all. And there are two different types of overbreadth. One involves third-party standing and one doesn't. The one that doesn't is this is overbroad as applied to me because it suppresses more of my speech than is necessary, and that has never been addressed, wasn't addressed below. I also wanted to say that Mr. Buck was mistaken when he told you that there were 50,000 people in Seattle on Monday evening, still causing problems, and I want you to hopefully take a look at his own supplemental excerpts of records. On page 42, there is an after-action report written by Captain Wingstrand, written by a Seattle police officer after the event saying that at 6 o'clock he and a number of officers. 6 a.m. No, 6 p.m. That's what I thought. 6 p.m. on Monday evening took a bunch of officers to sweep the downtown. That is, they walked. I don't remember whether they walked from Yesler to Lenora or from Lenora to Yesler, but they said they started that sweep at 6, they ended it at 7.30, and in the record it says we completed this about 7.30, 19.30 hours with no problems as the rioters had left the downtown area. And the last thing I wish to say is that Mr. Buck said that it was not our intent to suppress speech. And I just want to say that that is black-letter law, that it is irrelevant what their intent was. I think we got your argument. I know. So this case will be submitted. However, if we request supplemental briefing, we'll do it by order, and in that case, we'll vacate the submission and resubmit. Okay? We will take a break, even though the next case is related. We'll take a break for 15 minutes to make sure we're fresh to address the separate issues. Thank you.
judges: Gould, Paez, Silver